IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 32667-5-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. MCNEARNEY, | ) | OPINION PUBLISHED IN PART |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — Michael McNearney appeals his convictions for second degree

theft by deception and fourth degree assault with sexual motivation. For the first time on

appeal, he argues that because the State presented evidence of two assaults without

electing the one on which it relied for its charge, the trial court erred in failing to provide

the jury with a *Petrich*[1] instruction. He also contends the prosecuting attorney committed

misconduct in closing argument by trivializing the State's burden of proof.

---

[1] *State v. Petrich*, 101 Wn.2d 566, 572, 683 P.2d 173 (1984), *overruled in part on
other grounds by State v. Kitchen*, 110 Wn.2d 403, 756 P.2d 105 (1988), *abrogated in
part on other grounds by In re Pers. Restraint of Stockwell*, 179 Wn.2d 588, 316 P.3d
1007 (2014).

In the published portion of this opinion, we address the assignment of error for failure to give a *Petrich* instruction. Because the two acts of assault were against the same victim, occurred within a matter of moments at the same general location, and were alleged to be ongoing sexual harassment, we conclude as a threshold matter that if constitutional error did occur, it was not manifest. If the two acts were not a part of a continuous course of conduct, the trial court could certainly perceive them to be, absent argument otherwise from Mr. McNearny. We decline to consider the claimed error for the first time on appeal.

In the unpublished portion of this opinion, we reject Mr. McNearney's argument that the prosecutor engaged in misconduct. For that reason, and because Mr. McNearney raises no viable issue in his statement of additional grounds, we affirm.

## FACTS

On February 26, 2014, Michael McNearney patronized the lounge on the main floor of the Davenport Tower Hotel in Spokane. While there, Mr. McNearney and his female companion made comments to and about one of the cocktail waitresses that the waitress perceived as sexual and that were unwelcome. They talked about wanting to take the waitress "upstairs"[2] and commented on her "rear-end." Report of Proceedings (RP) at 98. At one point, as the waitress walked past Mr. McNearney, he reached under

---

[2] At the Davenport Towers, hotel rooms are "upstairs" from the lounge.

2

the tray she was holding and "grabbed" her vaginal area. RP at 99-100, 115. While grabbing her, he said, "I want that." RP at 99.

Mr. McNearney got up to leave the lounge area about five or six minutes later, and as he was leaving the lounge area, he again touched the same cocktail waitress. This time, he reached out and touched her stomach. The second touching was caught on the hotel's surveillance video.

The State charged Mr. McNearney with a single count of fourth degree assault with sexual motivation. The same information also charged Mr. McNearney with second degree theft by deception. The theft charge was based on entirely separate events.

A joint trial was held on the two charges. The State presented the waitress's testimony that Mr. McNearney grabbed her vaginal area and the surveillance video showing that he touched her stomach moments later. The State did not elect which of these unwanted touches was the basis for the assault charge. Mr. McNearney neither requested a *Petrich* instruction nor objected to the court's jury instructions. The court did not instruct the jury on unanimity.

In its rebuttal to Mr. McNearney's closing argument, the State attempted to illustrate the reasonable doubt standard with a story about Bigfoot, the mythical ape-man. Mr. McNearney did not object.

The jury returned a verdict of guilty on both counts, along with a special verdict that the assault was committed with sexual motivation. Mr. McNearney appeals.

3

ANALYSIS

*A. Jury Unanimity*

Mr. McNearney contends he was denied his right to a unanimous jury verdict under the Sixth Amendment of the United States Constitution because the State presented evidence of two assaults (either of which could have constituted the charged crime), did not elect which act it was relying on to support the conviction, and the trial court failed to instruct the jury on the requirement of unanimity.

"In Washington, a defendant may be convicted only when a unanimous jury concludes that the criminal act charged in the information has been committed." *Petrich*, 101 Wn.2d at 569. "When the evidence indicates that several distinct criminal acts have been committed, but [the] defendant is charged with only one count of criminal conduct, jury unanimity must be protected." *Id.* at 572. To adequately protect jury unanimity, either the State must elect the specific act on which it relies for the crime charged, or the court must give the jury a "*Petrich*" instruction, explaining that all "12 jurors must agree that the same underlying criminal act has been proved beyond a reasonable doubt." *Id.* "[F]ailure to follow one of these options is error, violative of a defendant's state constitutional right to a unanimous jury verdict and United States constitutional right to a jury trial." *State v. Kitchen*, 110 Wn.2d 403, 409, 756 P.2d 105 (1988).

The requirement for either an election by the State or a *Petrich* instruction applies only when the State presents evidence of several distinct criminal acts. *State v. Handran*,

4

113 Wn.2d 11, 17, 775 P.2d 453 (1989). "It does not apply where the evidence indicates a 'continuing course of conduct.'" *Id.* (quoting *Petrich*, 101 Wn.2d at 571). Generally, evidence that the charged conduct occurred at different times and places tends to show that several distinct acts occurred rather than a continuing course of conduct. *Id.* By contrast, evidence that the defendant engaged "in a series of actions intended to secure the same objective" indicates a continuing course of conduct. *State v. Fiallo-Lopez*, 78 Wn. App. 717, 724, 899 P.2d 1294 (1995). In determining whether an act is one of several distinct criminal acts or part of a continuing course of conduct "'the facts must be evaluated in a commonsense manner.'" *Handran*, 113 Wn.2d at 17 (quoting *Petrich*, 101 Wn.2d at 571).

The State concedes it did not elect which of the two touchings it was relying on to prove the assault charge and that the court did not give a unanimity instruction. But in addition to arguing the assaults were part of a continuing course of conduct, it makes a threshold argument that Mr. McNearney waived any instructional error by failing to raise it at trial. Mr. McNearney argues that the error is manifest constitutional error that can be raised for the first time on appeal.

RAP 2.5 generally precludes an appellant from raising an issue for the first time on appeal. One exception to this rule exists when an appellant can demonstrate a "manifest error affecting a constitutional right." RAP 2.5(a)(3). "To meet RAP 2.5(a) and raise an error for the first time on appeal, an appellant must demonstrate (1) the error

is manifest, and (2) the error is truly of constitutional dimension." *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). The constitutional error exception "is not intended to afford criminal defendants a means for obtaining new trials whenever they can 'identify a constitutional issue not litigated below.'" *State v. Scott*, 110 Wn.2d 682, 687, 757 P.2d 492 (1998) (quoting *State v. Valladares*, 31 Wn. App. 63, 76, 639 P.2d 813 (1982), *rev'd in part on other grounds*, 99 Wn.2d 663, 664 P.2d 508 (1983)).

An error is considered manifest when there is actual prejudice. The focus of this analysis is on whether the error is so obvious on the record as to warrant appellate review. *O'Hara*, 167 Wn.2d at 99-100. An appellant can demonstrate actual prejudice by making a plausible showing that the asserted error had practical and identifiable consequences in the trial. *State v. Irby*, 187 Wn. App. 183, 193, 347 P.3d 1103 (2015) (citing *State v. Gordon*, 172 Wn.2d 671, 676, 260 P.3d 884 (2011)).

"[T]o determine whether an error is practical and identifiable, the appellate court must place itself in the shoes of the trial court to ascertain whether, given what the trial court knew at that time, the court could have corrected the error." *O'Hara*, 167 Wn.2d at 100. Importantly, "[i]t is not the role of an appellate court on direct appeal to address claims where the trial court could not have foreseen the potential error or where the prosecutor or trial counsel could have been justified in their actions or failure to object." *Id.*

6

Given the evidence presented, we find that the failure of the court to give a *Petrich* instruction, if error at all, does not merit review under the RAP 2.5(a)(3) exception. If error occurred, it was surely constitutional, *see Fiallo-Lopez*, 78 Wn. App. at 725; *State v. Hepton*, 113 Wn. App. 673, 684-85, 54 P.3d 233 (2002); *State v. Camarillo*, 115 Wn.2d 60, 63 n.4, 794 P.2d 850 (1990), but Mr. McNearney has failed to demonstrate that it was manifest.

Placing ourselves in the shoes of the trial court, it was not at all apparent that the two touchings could be viewed as separate acts, as opposed to a continuing course of conduct. Both acts were preceded by Mr. McNearney's sexual innuendo. Within moments of his suggestive sexual statements, Mr. McNearney grabbed the waitress in the vaginal area and said "I want that." RP at 99. Within five or six minutes, Mr. McNearney again touched the waitress in an inappropriate manner. While the second touching occurred after Mr. McNearney had risen from his seat and was leaving the lounge area, both occurred in or on the perimeter of the lounge area of the main floor of the Davenport Tower. If the jury believed the waitress—and it believed her enough to find Mr. McNearney guilty—all of Mr. McNearney's objectionable actions were a part of an ongoing crass and demeaning "flirtation/molestation" that took place over the amount of time it took Mr. McNearney to finish his drink.

Mr. McNearney now argues that because there was a break in time and a change in location between the two touchings, they lack the continuity necessary to show an

7

ongoing course of conduct and were, instead, separate and distinct events. But in analyzing the waiver issue, we do not engage in the analysis the trial court would have conducted if Mr. McNearney proposed a *Petrich* instruction or objected and thereby brought the unanimity issue to the trial court's attention. We focus on what was manifest where no objection was raised and no such arguments were made.

We also note that the trial court reasonably would not expect the defense to argue the acts were separate and distinct. The jury instruction conference was conducted by the trial court before the close of the State's case. Had Mr. McNearney's attorney requested a unanimity instruction, he would have essentially conceded that Mr. McNearney's conduct lent itself to more than one criminal charge. The State could have moved to amend the criminal information and add an additional count of fourth degree assault.[3] *See* CrR 2.1(d). A second assault conviction would have exposed Mr. McNearney to an additional year of incarceration. For this additional reason, defense acquiescence in the court's instructions and the State's position would have seemed natural and appropriate to the trial court.

---

[3] The State suggests that had this occurred, had the State been permitted to amend the information to allege an additional count of fourth degree assault, and had Mr. McNearney been convicted of both crimes, the argument on appeal would have been of a double jeopardy violation. *See, e.g., State v. Brown,* 159 Wn. App. 1, 9, 248 P.3d 518 (2010).

Because the issue was not preserved for review and no exception exists, we decline to review Mr. McNearney's challenge.

We affirm.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder having no precedential value shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

Unpublished text follows

### B. Prosecutorial Misconduct

Mr. McNearney complains that prosecutorial misconduct requires he receive a new trial.

To prevail on a claim of prosecutorial misconduct, a defendant must show that the prosecutor's conduct was both improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012) (citing *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011)). Where, as here, the defendant did not object at trial, the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that it could not have been neutralized by a curative instruction. *Emery*, 174 Wn.2d at 760-61 (citing *State v. Stenson*, 132 Wn.2d 668, 726-27, 940 P.2d 1239 (1997)). In analyzing prejudice, this court does not look at the comment in isolation, but in the context of the total argument, the issues in the case, the evidence, and the instructions

9

given to the jury. *State v. Yates*, 161 Wn.2d 714, 774, 168 P.3d 359 (2007). It is

presumed the jury followed the court's instructions. *State v. Grisby*, 97 Wn.2d 493, 499,

647 P.2d 6 (1982).

Here, the challenged conduct was a result of the following story the State told the

jury:

> Now, there's this story that prosecutors will sometimes tell to make
> an example of what reasonable doubt may or may not be, and sometimes it
> may seem like you're making light of the situation; so please forgive me.
> I'm not meaning to make light of the situation to make this seem any less
> serious than it is. But reasonable doubt, you can almost look at it—and I'll
> just tell this story.
>
> You are home. It's a rainy day. You're home, and you're there with
> your daughter, your granddaughter, whatever the case may be; Sally. We'll
> call her Sally. Sally is about 8 years old.
>
> It's a rainy day. Sally wanted to go out and play. She can't. She
> can't because it's raining. So you decide, I got to do something to get Sally
> entertained. Let's go make some brownies.
>
> You go in and make the brownies. You can tell Sally's so excited.
> She's mixing away. She's thinking about getting that hot brownie and
> getting to eat it. You start to put the brownies in the oven. You put them in
> the oven. You're telling Sally, [w]e're going to be eating these here in a
> few minutes.
>
> You pull them out of the oven. They're still piping hot. The phone
> rings. You've got to go into the living room to go answer that—answer
> that phone; it's in the living room. And you can tell Sally's just really,
> again, chomping at the bit to get at those brownies. But you don't want her
> to get at them because she might burn herself.
>
> You go out into the living room. You answer the call. You come
> back a few minutes later. What do you find? You find that there's some
> brownies missing from the tray. You look at Sally. Sally has a couple of
> crumbs on her face.
>
> You go, Sally, I told you don't eat the brownies. You're going to
> get burnt. She goes, Mom, Grandma, whatever the case may be, I didn't
> eat them. Bigfoot ate them.

Bigfoot ate them? Well, that's ridiculous. Then you think, well, I don't have any proof Bigfoot didn't eat them.

But is that a reasonable doubt that Sally ate those brownies? Again, you didn't actually see her eat them. Sure, you might have some tiny doubt after you kind of get past the fact that, boy, that sounds ridiculous. But is that reasonable doubt?

Consider that when considering reasonable doubt. Consider that when considering all of the elements of the offense, the testimony that you have heard. And again, the state is asking you to return a verdict of guilty to the two offenses charged along with the enhanced—the special findings. Thank you.

RP at 359-61.

The State argues on appeal that the prosecutor told this story in response to defense counsel's argument that because there was no video showing Mr. McNearney grabbing the waitress, a reasonable doubt existed as to whether or not the waitress was fabricating the allegations.

In support of his argument on appeal that the analogy was improper, Mr. McNearney cites *State v. Anderson*, 153 Wn. App. 417, 220 P.3d 1273 (2009); *State v. Walker*, 164 Wn. App. 724, 265 P.3d 191 (2011), *review granted, cause remanded*, 175 Wn.2d 1022, 295 P.3d 728 (2012); and *State v. Johnson*, 158 Wn. App. 677, 243 P.3d 936 (2010). These cases are distinguishable.

The *Anderson* court recognized that analogizing the reasonable doubt standard to "everyday decisions" may be improper if it trivializes the gravity of the State's burden.

The prosecutor's comments discussing the reasonable doubt standard in the context of everyday decision making were also improper because they minimized the importance of the reasonable doubt standard and of the

11

jury's role in determining whether the State has met its burden. By comparing the certainty required to convict with the certainty people often require when they make everyday decisions—both important decisions and relatively minor ones—the prosecutor trivialized and ultimately failed to convey the gravity of the State's burden and the jury's role in assessing its case.

153 Wn. App. at 431. There, the prosecutor argued people are convinced beyond a reasonable doubt in their everyday life when they choose to leave their children with a babysitter or when they choose to change lanes on a freeway. *Id.* at 425. The court concluded that these comments, while improper, were not flagrant or ill intentioned. *Id.* at 432.

By contrast, in *Walker*, the court determined that the prosecutor's remarks were improper when the prosecutor "argued that the reasonable doubt standard 'is a common standard that you apply every day' and compared it to having surgery and leaving children with a babysitter." *Walker*, 164 Wn. App. at 732.[4] The court determined the cumulative effect of the "everyday decision" argument, along with error from other improper arguments—including a "fill in the blank" argument, a "declare the truth" argument, and a misstatement of the law on self-defense—amounted to prejudicial error.

---

[4] Washington's Supreme Court granted review of the matter and remanded the case for reconsideration in light of its decision in *State v. Emery*, 174 Wn.2d 741. On remand, Division Two of this court reaffirmed that the arguments were flagrant and ill intentioned and therefore improper, and that the cumulative error was so prejudicial that it could not have been remedied by a curative instruction. *State v. Walker*, noted at 173 Wn. App. 1027 (2013), *review denied*, 177 Wn.2d 1026, 309 P.3d 504 (2013).

164 Wn. App. at 737-38. The "fill in the blank" argument, which is not at issue on this appeal, is improper because it subverts the presumption of innocence. *See Anderson*, 153 Wn. App. at 431.

Finally, in *Johnson*, the prosecutor analogized the reasonable doubt standard to a partially completed puzzle, explaining that if you can put half the puzzle together you know what the whole picture is. 158 Wn. App. at 684-85. The court found this trivialized the State's burden and was improper. *Id.* The court reversed and remanded for a new trial. *Id.* at 685-86.

Here, the Bigfoot analogy, while silly, did not trivialize the State's burden of proof. Instead, immediately before telling the Bigfoot story, the prosecutor implored the jury to

> Please pay attention to reasonable doubt. We're counting on you to pay attention to reasonable doubt. Because when you got selected as a juror a couple of days ago, no one told you you need to check your common sense at the door, folks. We want you to use your common sense and apply it to the definition of reasonable doubt.

RP at 359. Taken in context, as it must be, the Bigfoot analogy was intended as a response to Mr. McNearney's argument that, because there was no video of Mr. McNearney grabbing the waitress, the jury could have reasonable doubt. Whether it was an effective response is questionable; certainly Mr. McNearney's lawyer had a more effective argument for reasonable doubt than that Bigfoot grabbed the cocktail waitress.

13

And finally, the court provided the jury with an instruction on reasonable doubt.[5] A jury is presumed to follow the court's instructions.

The State did not define reasonable doubt. It merely asked the jury to use its common sense to determine whether a reasonable doubt existed. Because the statements were not improper, Mr. McNearney has failed to show prosecutorial misconduct.

### C. Statement of Additional Grounds

In a pro se statement of additional grounds (SAG), Mr. McNearney raises two. In both, he argues he received ineffective assistance of counsel.

A court reviewing a claim of ineffective assistance of council will engage in a two-part test. First, the defendant must show he received deficient representation. *State v. Mierz*, 127 Wn.2d 460, 471, 901 P.2d 286 (1995) (citing *Strickland v. Washington*, 466 U.S. 668, 688-89, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). Deficient performance is determined using an objective standard of reasonableness. *State v. Stenson*, 132 Wn.2d

---

[5] The instruction reads:

> A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or lack of evidence. If, from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt.

Clerk's Papers at 28.

668, 705-06, 940 P.2d 1239 (1997). Second, the defendant must show he or she suffered prejudice as a result of the deficient performance. *Mierz*, 127 Wn.2d at 471 (citing *Strickland*, 466 U.S. at 687). Prejudice will result if "'counsel's errors were so serious as to deprive the defendant of a fair trial.'" *Id.* (quoting *Strickland*, 466 U.S. at 687). "This showing is made when there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different." *Id.* (citing *State v. Thomas*, 109 Wn.2d 222, 226, 743 P.2d 816 (1987). A reasonable probability is a probability sufficient to undermine confidence in the outcome—it does not require a showing that the outcome would more likely than not be altered. *State v. Tilton*, 149 Wn.2d 775, 784, 72 P.3d 735 (2003) (citing *Strickland*, 466 U.S. at 693-94).

"In this assessment, the appellate court will indulge in a strong presumption that the defendant was properly represented." *Meirz*, 127 Wn.2d at 471 (citing *Strickland*, 466 U.S. at 688-89). In order to rebut this presumption, a defendant alleging ineffective assistance of counsel must prove counsel's representation was unreasonable "under prevailing professional norms and that the challenged action was not sound strategy." *In re Davis*, 152 Wn.2d 647, 673, 101 P.3d 1 (2004). "The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances." *Id.*

Mr. McNearney argues that he received ineffective assistance of trial counsel when defense counsel "refused" to interview witnesses before trial. SAG at 1. The

15

No. 32667-5-III
*State v. McNearney*

record here does not permit us to review this issue. The issue involves factual allegations outside the record of this appeal. Mr. McNearney's remedy is to seek relief by personal restraint petition. *State v. Norman*, 61 Wn. App. 16, 27-28, 808 P.2d 1159 (1991).

Mr. McNearney also argues his attorney did not adequately explain his right to sever the two cases. Here, though, the record indicates that trial counsel discussed the potential for severing the two counts with Mr. McNearney. The record further indicates that Mr. McNearney wished to have the counts tried together.

> [DEFENSE COUNSEL]: And I just wanted to put something else on the record—
> THE COURT: Go ahead.
> [DEFENSE COUNSEL]: —if I could. Mr. McNearney and I have talked about this numerous times. I understand that normally these cases wouldn't be tried together because they're two separate victims, two separate places, and the crimes aren't related. And I talked to Mr. McNearney about moving to sever the cases for trial, but in the interest of economy, he'd just as soon try the two of them together. Otherwise, it's going to take up one more week.
> THE COURT: Is that correct?
> MR. MCNEARNEY: Yes, Your Honor.
> THE COURT: Okay. Thank you for that record.

RP at 5. There was no error.

We affirm.

Siddoway, C.J.

I CONCUR:

Lawrence-Berrey, J.

16

No. 32667-5-III

FEARING, J. (concurring) — I concur in the majority's ruling. I write separately, not because I disagree with the majority on any of its analysis, but because I disagree with the Supreme Court's distortion of the term "manifest" in the context of RAP 2.5(a)'s standard of "manifest constitutional error." The majority correctly notes that our state high court has declared "manifest" to be "prejudicial." *State v. O'Hara*, 167 Wn.2d 91, 99-100, 217 P.3d 756 (2009). Use of the word "prejudicial" to denote "manifest" alters the latter term.

When interpreting court rules, the court approaches the rules as though they had been drafted by the legislature. *State v. McIntyre*, 92 Wn.2d 620, 622, 600 P.2d 1009 (1979). Generally, we apply rules of statutory construction when interpreting court rules. *State v. Blilie*, 132 Wn.2d 484, 492, 939 P.2d 691 (1997); *WESCO Distrib., Inc. v. M.A. Mortenson Co.*, 88 Wn. App. 712, 715, 946 P.2d 413 (1997). If the court rule does not define a term, we determine the plain and ordinary meaning from a standard dictionary. *State v. Taylor*, 150 Wn.2d 599, 602, 80 P.3d 605 (2003); *State v. Watson*, 146 Wn.2d 947, 954, 51 P.3d 66 (2002); *State v. Mankin*, 158 Wn. App. 111, 122, 241 P.3d 421

(2010).

*Webster's Third New International Dictionary* 1375 (1993) defines "manifest" as:

> **1 a :** capable of being readily and instantly perceived by the senses and especially by the sight : not hidden or concealed : open to view
> **b :** capable of being easily understood or recognized at once by the mind : not obscure : obvious
> **c :** being the part or aspect of a phenomenon that is directly observable : concretely expressed in behavior : overt
> **2 :** bearing evident marks or signs

*Roget's International Thesaurus* 348.8 (5th ed. 1992) lists several synonyms for the adjective form of manifestation: apparent, evident, self-evident, axiomatic, indisputable, obvious, plain, clear, perspicuous, distinct, palpable, patent, tangible, visible, perceptible, perceivable, discernible, seeable, observable, noticeable, much in evidence, to be seen, easy to be seen, plain to be seen, plain as day, plain as the nose on one's face, plain as a pikestaff, big as life, big as life and twice as ugly, crystal-clear, clear as crystal, express, explicit, unmistakable, not to be mistaken, open-and-shut, self-explanatory, self-explaining, and indubitable. Synonymous words found for "manifest" in my Microsoft Word program include obvious, patent, apparent, evident, clear, visible, marked, noticeable, discernable, plain, observable, unmistakable, and distinct. Neither the dictionary nor the thesaurus employ the word "prejudicial" or another word similar in meaning to "prejudicial."

We note that *Black's Law Dictionary* also distorts the definition of "manifest constitutional error." The legal dictionary demarcates the phrase as "[a]n error by the trial court that has an identifiably negative impact on the trial to such a degree that the

2

constitutional rights of a party are compromised." BLACK'S LAW DICTIONARY 660 (10th ed. 2014). Nevertheless, rules of construction direct us to employ a lay dictionary, not lawyers' argot.

We remain bound by the Supreme Court's construction of "manifest." Once a court rule has been construed by the Supreme Court, the construction operates as if it were originally written into the rule. *In re Pers. Restraint of Moore*, 116 Wn.2d 30, 37, 803 P.2d 300 (1991); *State v. Darden*, 99 Wn.2d 675, 679, 663 P.2d 1352 (1983).

_____
Fearing, J.